**UNITED STATES of America,**

v.

**Gordon ROBINSON and Randall Robinson, Defendants.**

**Criminal Action No. 96–10047–REK.**

United States District Court,
D. Massachusetts.

March 23, 1998.

**156**

Paul E. Troy, Paul G. Lannon, Sherburne, MA, Powers & Needham, Boston, MA, for Samuel Patrick.

James J. Cipoletta, Cipoletta & Ogus, Revere, MA, for Eugene Terrell Patrick.

Roger Witkin, Boston, MA, for Darius Hines.

William M. White, Jr., Davis, Robinson & White, Boston, MA, for Dana A. Hines.

Benjamin D. Entine, Lynn, MA, for Jason Arthur.

Thomas J. Ford, Boston, MA, for Allen Ivy.

Diana L. Maldonado, Boston, MA, for Cecil McKnight.

Elliot M. Weinstein, Boston, MA, for Gordon Robinson.

Thomas C. Horgan, Boston, MA, Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, for John Robinson.

Michael J. Liston, Glass, Seigle & Liston, Boston, MA, for Randall Robinson.

Joan M. Griffin, Casner & Edwards, Boston, MA, for Francis Coleman.

Michael F. Natola, Natola & Natola, Peabody, MA, for Michael Coleman.

William J. Keefe, Jamaica Plain, MA, for Michael Handy.

David Duncan, Zalkind, Rodriquez, Lunt & Duncan, Boston, MA, for Shawn Lewis.

Alice E. Moore, Mahoney, Hawkes & Goldings, Boston, MA, John M. Russell, Jr., Hull, MA, for Terrence Williams.

Lois M. Lewis, Law Office of Lois M. Lewis, West Newton, MA, for Dana Coleman.

George W. Vien, U.S. Atty's Office, Boston, MA, for U.S.

### Memorandum and Order

KEETON, District Judge.

### I. Background

On August 29, 1996, at approximately 5:30 a.m. Boston Police Officers and DEA Task Force Agents went to 101A Brunswick Street in Dorchester to execute arrest warrants for Gordon Robinson and Randall (Randy) Robinson. The officers were met at the door to the apartment by the defendants' mother, Denise Robinson. After the officers informed Mrs. Robinson that they had arrest warrants for Gordon and Randy, she let them enter the premises, and indicated that the defendants were downstairs in their respective bedrooms.

As the officers descended into the lower portion of the apartment, Gordon Robinson was seen emerging from his bedroom, on the right-hand side of the hallway. Police placed Gordon Robinson under arrest in the hallway and then made a protective sweep of Gordon Robinson's bedroom. During the protective sweep Sergeant Stephen Meade of the Boston Police Department saw, through a partially open sliding closet door, the butt of a weapon lying on a closet shelf. A Colt .357 revolver was seized. Also seized was an "IVP" mirror that was hanging on a bedroom wall in plain view.

Sergeant Meade informed Sergeant Detective Buckley that a weapon had been found. Sergeant Detective Buckley met with Denise Robinson and Gordon Robinson Sr. upstairs

in the kitchen in order to obtain consent to search the residence. During this meeting Denise Robinson stated that she was the lessee of the apartment, and she gave her oral and written consent to search the premises. Mrs. Robinson's written consent consisted of her signing the following form:

I, Denise Robinson, have been informed by Sgt Det Kevin Buckley of the Boston Police Dept Police [sic] that I may have the Constitutional right to refuse to allow a search to be made of my living quarters, property, car and/or person without a search warrant. I understand this right and I hereby waive the necessity of a search warrant and do authorize Sgt Det Kevin Buckley of the Boston Police to conduct a search of my living, [sic] quarters, property, car and/or person without a search warrant and to take possession of any material which is connected in any way with the investigation they are making.

I, Denise Robinson, am signing this form voluntarily without threats or promises of any kind.

/s/ Denise Robinson

Consent to Search Form, Exhibit 1.

Defendants moved to suppress evidence seized from 101A Brunswick street on August 29, 1996 (Docket Nos. 221 and 231, filed October 4 and 15, 1997, respectively). The government opposed the defendants' motions (Docket No. 240 and 241, filed November 14 and 18, 1997, respectively). The court held an evidentiary hearing on February 25, 1998, made some decisions, and deferred other decisions essential to final disposition of defendants' motions (Docket No. 221 and 231).

I leave the record (including the transcript of the hearing) to speak for itself about what the court did and did not decide at that time. In any event, any decision stated at that time may be reconsidered not only because the submissions filed after that hearing add more to the record, but also because the court has authority to reconsider. This Memorandum and Order will state my decision on all issues that I consider material to the disposition of these two motions.

The government filed a further submission after the hearing of February 25, 1998

(Docket No. 353, filed March 2, 1998), as did Defendant Randy Robinson (Docket No. 358, filed March 9, 1998). For the purposes of deciding these motions (Docket Nos. 221 and 231), the court assumes that Randy Robinson's submission serves as a submission on behalf of defendant Gordon Robinson, since during the evidentiary hearing of February 25, 1998 Randy Robinson's attorney, Michael Liston, argued on behalf of both defendants.

## II. Parental Consent to Search the Robinson Brothers' Bedrooms

Precedents have firmly established that a parent may consent to the search of a minor's bedroom. *See United States v. DiPrima*, 472 F.2d 550, 551–52 (1st Cir.1973) (finding mother had authority to consent to search of bedroom shared by defendant and his minor brothers). In this case, Randy Robinson, then aged nineteen, shared his bedroom with his younger brother Jermaine, a minor. No genuine dispute exists as to Mrs. Robinson's authority to consent to a search of that room.

■ The Gordon Robinson bedroom (as I will call it for convenient reference) presents a slightly more difficult question. *DiPrima* is not controlling in the case of this bedroom because Gordon Robinson, then aged twenty-three, was not a minor, and before the search the officers had no indication that anyone other than Gordon Robinson used this bedroom. The government argues that several items seized from the Gordon Robinson bedroom, including two hospital identification cards of Jermaine Robinson and a prescription made out to Jermaine Robinson, indicate joint use by the minor brother, and thus, confirm Denise Robinson's authority to consent to the search of the Gordon Robinson bedroom. *See* Government's Supplemental Response (Docket No. 353 at 3).

I conclude that this evidence of joint use does not support an argument that at the time they searched the Gordon Robinson bedroom the officers reasonably believed that Mrs. Robinson had the authority to consent to a search of the Gordon Robinson bedroom. The reason for my conclusion is that the officers did not know of the exis-

tence of the papers in the Gordon Robinson bedroom before they conducted the search.

■ A third party may consent to the search of a common area. The United States Supreme Court confirmed the legitimacy of third-party consent, finding that consent rests

> on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The burden of establishing common authority rests on the government. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Some debate exists as to whether *joint access* is sufficient to establish authority to consent to search, or whether there must also be a finding of *mutual use. Compare United States v. Rith,* 954 F.Supp. 1511, 1515 (D.Utah 1997) (finding no actual use was required and that father's consent to search house extended to search of eighteen-year-old son's bedroom), *with Reeves v. Warden,* 346 F.2d 915, 925 (4th Cir.1965) (finding mother did not have authority to consent to search of adult son's bedroom and dresser despite her access to the room because the room and dresser were exclusively used by the son).

The searching officers must determine whether one of them, or an officer not in the room with them, had acquired consent to search the room from a party authorized to give consent. And, of course, searching officers' determinations are not flawless. A precisely correct factual determination, however, is not what is required. Rather, as applied to the circumstances of record before me, the law requires that the officers have an objectively reasonable basis for understanding that a third person (the mother) had authority to consent to the search of the Gordon Robinson bedroom. *See Rodriguez,* 497 U.S. at 186 (finding it reasonable for officers to assume that defendant's girlfriend, a former

co-tenant, who still had possessions in the apartment and a key, had the authority to consent to a search). "*Rodriguez* thus applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be." *United States v. Whitfield,* 939 F.2d 1071, 1074 (D.C.Cir.1991). In other words, *Whitfield* says (though perhaps as *obiter dictum;* see quoted passage below) that *Rodriguez* protects searches conducted by officers operating under an objectively reasonable basis for understanding that a third person had authority to consent to the search, even if that understanding was based on a mistake of fact.

The issue of parental authority to consent to a search of an adult child's bedroom has been addressed by three Circuit Courts of Appeals with differing results. *See United States v. Ladell,* 127 F.3d 622 (7th Cir.1997) (finding authority); *Whitfield,* 939 F.2d 1071 (the D.C. Circuit finding no authority); *Reeves,* 346 F.2d 915 (the Fourth Circuit finding no authority). In *Whitfield,* agents sought a mother's permission to search her adult son's bedroom for evidence of a recent bank robbery. The agents asked the defendant's mother if the defendant paid rent, and although her response is disputed, the district court found that some form of a landlord-tenant relationship existed between the mother and son. *Id.* at 1072. The agents also asked the mother if the son's bedroom was locked. *Id.* at 1073. When she responded that the room was not locked, the agents took this to be a sign of joint access. *Id.* The Court of Appeals for the District of Columbia Circuit decided:

> As a factual matter, the agents could not reasonably have believed [defendant's mother] had authority to consent to this search. The agents simply did not have enough information to make that judgment.

*Id.* at 1074. More specifically, the agents did not ascertain whether "mutual use" had occurred. Thus, the "warrantless entry [was] unlawful without further inquiry." *Id.* at 1075 (quoting *Rodriguez*). In a similar mother-son case, a mother, not the homeowner, but a guest of her daughter, purport-

edly gave consent to police to search the defendant son's bedroom and a dresser in the room. *See Reeves*, 346 F.2d at 917. The Court of Appeals for the Fourth Circuit determined that the mother, despite her access, did not have authority to consent to the search of her son's room and dresser because the room and dresser were "habitually and exclusively" used by the defendant. *Id.* at 925.

On the other hand, the Court of Appeals for the Seventh Circuit determined that a mother had the authority to consent to a search of her adult son's bedroom. *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997). In *Ladell*, police responded to a domestic violence dispute between an adult brother and sister. *Id.* at 622. The defendant's mother told police they could "search anywhere," and they found a gun in a bag, under a mattress, in the son's bedroom. *Id.* at 624. The court determined that the mother did have authority to consent to the search. As explained below, that decision may have been based on the mother's subjective concerns about safety.

■ In the case now before this court, the record lacks any evidence that the officers made any inquiry as to whether Gordon Robinson paid rent, or whether Mrs. Robinson made use of the Gordon Robinson bedroom. Thus the government has not made any evidentiary showing of a landlord-tenant relationship or any showing that Mrs. Robinson had access to or use of her son's bedroom. In *Matlock*, the Court approved consent by a third party who had "joint access or control for most purposes." 415 U.S. at 171 n. 7. Although no decision of the Court of Appeals for the First Circuit is directly on point, *United States v. Hyson*, 721 F.2d 856 (1st Cir.1983), is instructive. In that case, one defendant, staying as a guest at another defendant's leased apartment for a period of five weeks, consented to a search of the apartment. The lessee defendant argued that the guest defendant lacked authority to consent to the search and, thus, that hashish found in the closet should be suppressed. *Id.* at 859. The Court of Appeals for the First Circuit noted that the lessee defendant did not claim that the closet was restricted

for his own personal use. *Id.* Gordon Robinson's situation is similar; he did not claim that his room was restricted for his own personal use. I find, on the record before me, that Denise Robinson had access to the Gordon Robinson bedroom.

■ In addition to access and use, courts have examined other factors not stated to have been involved in *Matlock.* One such factor is that of the kind of relationship existing between the defendant and the consenting third person. *See, e.g., Stoner v. State of Cal.*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel clerk did not have authority to consent to a search); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a tenant's house); *Ladell*, 127 F.3d at 624 (parent-child relationship conferred authority); *United States v. Harrison*, 679 F.2d 942, 946 (8th Cir.1982) (spouse had authority to consent to search of cardboard boxes); *DiPrima*, 472 F.2d at 552 (parent-child relationship conferred authority). A familial relationship, such as that of a parent and child or husband and wife, weighs in support of authority to consent. A landlord-tenant relationship does not.

Gordon Robinson had a close relationship with the lessee; she was his mother. The government, however, did not submit any evidence that Denise Robinson had any other basis than this mother-son relationship that would weigh in favor of her having access to the Gordon Robinson bedroom for purposes beyond cleaning, doing laundry, and conducting other usual household activities.

On the other hand, the defendant did not offer any evidence that his mother did not have access to his bedroom.

In these circumstances, I conclude that this is the kind of case that the Court of Appeals for the First Circuit anticipated when it stated that "[t]o some extent the police must be allowed to rely on the word of the householder and general appearances." *DiPrima*, 472 F.2d at 552. Generally, a mother has access to the bedroom of an adult son who still lives at home for usual household activities. If the adult son contends that the relationship was exceptional, evi-

dence to prove it would normally be available. No such evidence was proffered by the defendant here.

A second, albeit more subtle, factor sometimes considered by courts in exploring third-party consent, has been the third person's concern about safety. Recently, the Court of Appeals for the Seventh Circuit decided that a mother had authority to consent to a search of her adult son's bedroom where she was concerned for her and her family's safety. *Ladell*, 127 F.3d at 624. Under a totality-of the-circumstances test, the court took into account the parent-child relationship, the fact that the mother was the lessee of the premises, and the mother's safety concerns. The final decision was that the consent was valid. *Id.* A district court reached a similar decision where a father was concerned about safety when he saw his eighteen-year-old son bring a gun into the house. *United States v. Rith*, 954 F.Supp. 1511 (D.Utah 1997). One of the factors relied upon by the court in *Rith* was that the parents "manifested their authority over the premises by inviting the police to search their home for the purpose of finding and removing illegal weapons." *Id.* at 1515. The court, in a footnote, criticizes the D.C. Circuit's decision in *Whitfield*, and after citing *DiPrima* states

> Contrary to the questionable guidance provided by *Whitfield*, under the circumstances in Defendant Rith's case, the police were correct in relying on general appearances and using their common sense in determining that Defendant's parents had authority to consent to a search of the entire premises absent some other facts indicating an extraordinary expectation of privacy.

954 F.Supp. at 1516 n. 1.

I do not undertake to resolve the issue of law posed by these clashing views regarding a third-party consenter's safety concerns. The First Circuit has not spoken directly to the issue, and even if it should reach a decision contrary to *Whitfield* on this matter, I do not find on the record before me evidence to support a government contention that the mother's consent in this case was materially influenced by safety concerns.

It is true that Sergeant Buckley, the officer who obtained Mrs. Robinson's consent, stated in his affidavit that Mrs. Robinson "said, in substance, that she had young children in the house and that she was tired of the gang related activity of her older children." Buckley Affidavit at ¶ 4. Also, it is true that Denise Robinson stated on the record during the evidentiary hearing that she wanted the officers to remove all other weapons from the premises. But these expressions as to Denise Robinson's safety concerns go only to concerns about having firearms in her apartment, and to a search of the Gordon Robinson bedroom for firearms. I have concluded on other grounds explained above, that Denise Robinson did have authority to and did manifest consent to search for that purpose as well as a search of the room for other items open to view in a sweep as distinguished from being in sealed containers. Safety concerns, if determined by the First Circuit to be properly weighed in this calculus, simply add more weight to an already sufficient basis for consent to search the room for firearms.

## III. Consent to Search Closed Containers within the Bedrooms

Now we come to the more difficult issue: did Denise Robinson have the authority to consent, and did she manifest consent, to a search of the closed containers within the bedrooms of her sons? This inquiry is complicated by the fact that the government's submissions do not identify where or how most of the items were seized. During the evidentiary hearing held on February 25, 1998, the government submitted a list of items seized as identified on Exhibit 5 as follows:

> multi-colored towel wrapped around a Jennings Bryco semi-auto
>
> inside a plastic movie box $900.00 U.S. Currency and four bags of white rock
>
> (appeared to be crack cocaine)
>
> inside a black vinyl case was an amount of white rock in plastic (appeared to be
>
> crack cocaine)
>
> Pocket Pro, Acculab 150–B electronic scale

Mass. Uniform Citation # E0564225 (Gordon Robinson)

two Boston City Hospital cards (Jermaine Robinson)

four receipts (Gordon Robinson)

one business card # 798–4764

one Boston City Hospital prescription (Jermaine Robinson)

small plastic zip-lock bags

one pair of blue pants, baggy fit, 36x30, with black Fila belt, in pockets were:

>one plastic bag of white rock (appeared to be crack cocaine)

>one beeper

>identification in name of Randy Robinson (Mass.license)

photo album

I.V.P. mirror

plastic bag containing crack cocaine (rear bedroom ceiling)

### A. Items in Plain View or Clearly within an Area for Which Denise Robinson Had Authority to and Did Consent to Search

Some of the items seized are not in controversy, or they present little difficulty. The prime examples are the I.V.P. mirror and an unlisted .357 Colt revolver, both found in plain view.

Other items that would commonly be found during a search of a room without opening any closed containers include the Pocket Pro, Acculab 150–B electronic scale, Gordon Robinson's Mass. Uniform Citation # E0564225, Jermaine Robinson's two Boston City Hospital cards, Gordon Robinson's four receipts, the business card # 798–4764, Jermaine Robinson's Boston City Hospital prescription, the small plastic zip-lock bags, and the photo album. No direct evidence was presented by any party as to whether these items were located inside any closed container. I conclude that these items were lawfully seized during the consent search of the bedrooms.

█ Also, the plastic bag containing crack cocaine found above the ceiling tiles of the rear bedroom (Randy and Jermaine's room), will not be suppressed. I conclude that Denise Robinson's consent to a search of that bedroom extended to a search of its ceiling. In a room not exclusively occupied by a defendant, the area above a dropped ceiling (composed of a structure into which easily removable "ceiling tiles" are placed) is *not* a container that is recognized as having an expectation of privacy.

█ The Jennings Bryco semi-auto wrapped in a multi-colored towel also will not be suppressed. Although Exhibit 5 does not indicate where the Jennings Bryco was found, oral testimony by Sergeant Detective Kevin Buckley during the evidentiary hearing of February 25, 1998 indicated that the weapon was found on a window sill in Gordon Robinson's bedroom behind a window shade. This is an area that would normally be searched in a room search. Wrapping something in a towel, or hiding it behind a window shade for that matter, do not implicate the heightened expectation of privacy that is associated with closed containers. Finally, an automatic weapon wrapped in a towel, would be identifiable as a weapon by an officer conducting a plain feel search. *See Minnesota v. Dickerson*, 508 U.S. 366, 371, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). So if the searching officer were to pull back the window shade and pat down the towel-wrapped object, the fact that it was a weapon would become immediately apparent. Thus, the Jennings Bryco was lawfully seized.

### B. Closed Containers within the Rooms

Remaining on the list of items on Exhibit 5 are a plastic movie box containing $900.00 in United States currency and four bags of white rock appearing to be crack cocaine; a black vinyl case containing an amount of white rock in plastic appearing to be crack cocaine; and one pair of baggy fit blue pants size 36x30, with a black Fila belt, the pockets of which contained a plastic bag of white rock appearing to be crack cocaine, a beeper, and Randy Robinson's Massachusetts drivers license.

When a third party grants consent to search a room he or she is not necessarily consenting to a search of the closed items within the room. *See United States v. Karo*, 468 U.S. 705, 725, 104 S.Ct. 3296, 82 L.Ed.2d

530 (1984) (O'Connor concurring) (When a private container, to which the homeowner has no right of access, enters the home "the homeowner also lacks the power to give effective consent to the search of the closed container.") For example, when a wife consented to a search of a janitor's room used by her husband, she did not necessarily consent to a search of his briefcase and private filing cabinet within the room. *See United States v. Rodriguez*, 888 F.2d 519, 523 (7th Cir. 1989); *see also United States v. Salinas–Cano*, 959 F.2d 861, 865 (10th Cir.1992) ("[O]wnership and control of property does not automatically confer authority over containers within it."). This is not to say, however, that all closed containers receive the same protection. Some closed containers evoke a higher expectation of privacy than others. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (finding consent to search the interior of a car included consent to search a paper bag lying on the floor of a car, but probably would not extend to consent to search a locked briefcase in the trunk); *compare United States ·v. Block*, 590 F.2d 535 (4th Cir.1978) (mother's consent to search son's room did not extend to consent to search son's locked footlocker) *with United States v. Sealey*, 830 F.2d 1028, 1031 (9th Cir.1987) (finding wife could consent to search of husband's unsealed cardboard boxes within the home).

The Court of Appeals for the Tenth Circuit has articulated a set of factors to consider in determining whether a third party had authority to consent to a search of a closed container. *Salinas–Cano*, 959 F.2d at 864–65. These factors include (1) whether the container is one that historically has commanded a high degree of privacy (such as suitcases and footlockers); (2) precautions taken by the owner to manifest his subjective expectation of privacy; (3) whether the search was undertaken at the behest of a third party concerned for the safety of the household; and (4) whether the third party has made his or her lack of interest in the item known to the official conducting the search. *Id.*

Thus the court is faced with the need to decide whether Denise Robinson had the authority to consent to a search of the plastic movie box, the vinyl bag, and the pockets of her son's jeans.

■ A plastic movie box is not the type of container that has historically been regarded as having a high expectation of privacy. Nor have the defendants proffered any evidence that either of them had taken action to limit Denise Robinson's or anyone else's access to the movie box. The defendants have not proffered evidence that Mrs. Robinson made her lack of authority to consent to a search of the movie box known to the searching officers. I find that the officers had a reasonable basis for relying on Mrs. Robinson's consent to search the movie box. I conclude that the $900.00 in United States currency and the amount of crack cocaine found within it were lawfully seized.

■ The black vinyl case is materially different from the movie box. A case of the type of this black vinyl case is similar in its usual function to a briefcase. A person may place private items in such a container and expect them to remain private. Also, as the defendants have pointed out, the consent form signed by Mrs. Robinson obtained her consent to search *her* living quarters, property, car and/or person. The officers were not reasonable in assuming that Mrs. Robinson had authority to and did consent to the search of an adult son's closed bag (similar to a briefcase) located in his bedroom. The officers actions are not protected by *Rodriguez*, because even if the facts were as the officers believed them to be, the search still would not have been authorized. The motions to suppress will be sustained as to the crack cocaine found in the vinyl bag.

Finally we come to the most difficult item of all: the pockets of the baggy jeans containing Randy Robinson's license, a bag of crack cocaine, and a beeper. Was it reasonable for the searching officers to assume that Denise Robinson's authority to consent, and her manifestation of consent, extended to the pockets of her adult son's pants? No cases directly on point have come to the court's attention. In suppressing items seized from an adult son's locked trunk when his mother

consented to a search of his room, the Court of Appeals for the Fourth Circuit noted that

> [o]bviously not every "enclosed space" within a room or other area—*e.g., pockets in clothes,* unsecured shoeboxes, and the like—can claim independent status as objects capable of search not within reach of the authorized area search. The rule has to be one of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object: whether it is secured, whether it is commonly used for preserving privacy, etc.

*Block,* 590 F.2d at 541 n. 8 (emphasis added). In *Block,* however, the court was not faced with a search of pockets in clothes. Rather, that search was of a locked trunk. The courts that have ruled against a search of pockets of clothing, within a room, have done so in circumstances in which they also decided that the room search was unauthorized. *See, e.g., Whitfield,* 939 F.2d at 1073 (officers found stolen money in pockets of coats hanging in adult son's closet but suppressed evidence because the mother had no authority to consent to a search of the room); *United States v. Lyons,* 706 F.2d 321, 329 (D.C.Cir. 1983) (weapon found inside coat pocket in hotel room closet suppressed because consenting hotel clerk lacked authority to consent to search of room). They did not need to reach the question before this court in this case.

 Pockets, although not "closed containers," do historically have a high expectation of privacy for several reasons. First. When clothing is worn, it is close to the body. Second. When a person is sharing living quarters with others, pockets of clothing are among the few places that an individual can expect to keep private.

In addition, other evidence supports an inference that Denise Robinson would not expect access to the pockets of her son's clothing. She would not have expected that she would need to explain to the officers to whom she was giving a consent to search that she had no interest in the 36x30 size pants that quite obviously belonged to one of her sons and not to her.

Absent other explanatory evidence, the fact that things were found in pants pockets supports an inference that the owner of the pants placed them there rather than leaving them lying about on a dresser or table in the room. An inference of a subjective expectation of privacy is warranted. In addition, the officers could feel the pants pocket area from the outside to ascertain whether any weapons were in the pockets. Denise Robinson's concern for safety has no significant bearing on her authority to consent to search the pants pockets.

Under a totality-of-the-circumstances test, I conclude that Denise Robinson did not have authority to consent to a search of her son's pants pockets. Also, on the evidence, the officers doing the search did not have the benefit of a mistake-of-fact test with respect to her ability to consent as would be allowed if the First Circuit approves that test. The motions to suppress will be sustained as to the beeper, license, and quantity of crack cocaine found inside the pants pockets.

### ORDER

For the foregoing reasons it is ORDERED:

Defendants Randy Robinson and Gordon Robinson's Motions to Suppress (Docket Nos. 221 and 231) are DENIED in part and ALLOWED in part.

(a) They are DENIED as to:

(1) the .357 Colt revolver;

(2) the I.V.P. mirror;

(3) the Pocket Pro, Acculab 150–B electronic scale;

(4) Gordon Robinson's Mass. Uniform Citation # E0564225;

(5) Jermaine Robinson's two Boston City Hospital cards;

(6) Gordon Robinson's four receipts;

(7) the business card # 789–4764;

(8) Jermaine Robinson's Boston City Hospital prescription;

(9) the small plastic zip-lock bags;

(10) the photo album;

(11) the plastic bag containing crack cocaine found above ceiling tiles in the rear bedroom;

(12) the Jennings Bryco semi-auto wrapped in a multi-colored towel; and

(13) the $900.00 in United States currency and four bags of crack cocaine found within the plastic movie box.

(b) They are ALLOWED as to:

(1) the crack cocaine found within the black vinyl case; and

(2) the crack cocaine, Randy Robinson's Massachusetts driver's license, and the beeper found within the pockets of the blue 36x30 pants with the Fila belt.